UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALBERTO CHAVEZ,

    Plaintiff,

v.

                             CASE NO. 8:24-cv-01863-SDM-NHA

CITY OF TAMPA WATER
DEPARTMENT,

    Defendant

_____/

## ORDER

Alleging discrimination and retaliation under federal and state law, Alberto Chavez sues (Doc. 12) the City of Tampa Water Department. Each party moves (Docs. 44 and 46) for summary judgment, each party responds (Docs. 50 and 59) to the other's motion, and each party replies (Docs. 60 and 63) to the other's response.

### BACKGROUND

**Official Account of the Plaintiff's Termination**

The defendant employed the plaintiff as a "water plant operator" at a wastewater treatment plant from January 16, 2018, until September 7, 2023. (Doc. 46 at 12; Doc. 46-1 ¶ 2) The plaintiff's position required a license from the Florida Department of Environmental Protection (DEP), and the Florida Administrative Code conditions licensure on, among other requirements, a

minimum number of working hours. DEP issues four classes of licenses — Class D, Class C, Class B, and Class A — with Class D the lowest and Class A the highest. (Doc. 45 at 5)

On June 14, 2023, the plaintiff, who then held a Class C license, remained 532 hours short of qualifying for a Class B license. (Doc. 45 at 5–6) On July 10, 2023, only twenty-six days later, the plaintiff's supervisor, aware since June 14 of the 532-hour deficit, learned that the plaintiff had obtained a Class B license. The supervisor instructed the plaintiff to produce a copy of the Class B license application, but the plaintiff refused. (Doc. 45 at 6) After obtaining the application from another source and reviewing the application, the supervisor learned that on June 16, 2023, a co-worker had signed the plaintiff's Class B license application as a favor and had left blank the section requiring the number of qualifying hours, which the plaintiff later filled in. (Doc. 45 at 6) The defendant suspended the attesting co-worker for his role in submitting the plaintiff's application. (Doc. 45 at 27)

On July 25, 2023, "as a result of some comments that [the plaintiff] made during a video . . . submitted to various city officials . . . the City referred [the plaintiff] to [the defendant's] Employee Assistance Program (EAP)."[1] (Doc. 45 at 9) The plaintiff missed the fitness-for-duty evaluation

---

[1] In the twenty-two minute three-second video, titled "CEASE AND DE-SIST…PLEASE" and addressed to Governor Ron DeSantis, Mayor Jane Castor, and various employees of the water plant, the plaintiff declares, among other grievances, "when you insinuate that someone is a forger, when you spread rumors about people, when you

(continued…)

scheduled with an EAP psychologist and missed the appointment rescheduled for the following day. (Doc. 45 at 25)

A September 7, 2023, "Notice of Disciplinary Action" directed to the plaintiff concludes:

> You knowingly signed and submitted to the [DEP] your "B" license application with falsified information showing you met the hours requirement, two days after your conversation with [the supervisor] about being short 532 . . . hours. You knowingly coerced your coworker into signing the application . . .
>
> On Tuesday, July 25, 2023, based on your recent behaviors you were mandated to [consult the EAP] provider." You were scheduled to meet with [a psychologist] who explained that you would begin a fitness for duty evaluation. You explained that you would like to review the documents and would meet back with [the psychologist] on Tuesday, August 1, 2024. Additionally, [the psychologist] instructed you not to contact anyone at the City of Tampa, but if you had any questions, you could contact [the psychologist's] office or [human resources] . . . [Y]ou did not follow [the psychologist's] instruction but contacted an employee at the Water Plant.
>
> On Tuesday, August 1, 2023, you failed to appear for your scheduled appointment. [The psychologist] rescheduled your missed meeting for Wednesday, August 02, 2023, and for the second time you failed to keep your scheduled appointment. On Wednesday, August 2, 2023, [the psychologist] advised Human Resources that you were again non-compliant with his program and directives.
>
> Most importantly, your actions as described above indicate that you deliberately submitted untruthful documentation to the DEP for your B-License. You intentionally falsified your . . . application and are in clear

---

consistently bring allegations about people, that festers in the body. It creates free-floating anxiety, and your immune system then drops. And what does that lead to? Cancer. So, literally, [the head of] HR is a cancer . . . [and] the manager of the . . . water plant is a cancer because they are insinuating that I'm doing something wrong. It causes cancer when you stress people out like this." (Doc. 76 at 4, 15)

violation of the City of Tampa Personnel Manual <u>B23, Code of Ethics</u> B (1) "No employee shall solicit or accept anything of value, including a . . . favor . . . based upon any understanding that the action or judgment of the employee would be influenced thereby." <u>B23.1 Fraud</u> (3) "Fraud has been defined as the intentional, false representation or concealment of a material fact for the purpose of inducing another to act upon it for personal benefit. Specific examples [include] . . . falsification of records . . .

Further, your behavior as described above is in violation of the City of Tampa Civil Service Rules & Regulations, Article D, Section 10 (b), medical requirements, and, the City of Tampa Personnel Manual B28.2A3 (a) <u>Incompetence</u> (1) "Inability to perform up to accepted work standards"; (b) <u>Insubordination</u> (2) "Disregard for or repeated failure to follow the instruction or direction of a supervisor"; and (d) <u>Moral Turpitude</u> (1) "Falsification, misrepresentation, or material omission of statements, testimony, or any document or record completed in the course of employment . . .

For these reasons, the defendant terminated the plaintiff's employment. (Doc. 45 at 9–10 and 11–13)

## The Alleged Anti-Hispanic Animus

The plaintiff, a man of Cuban origin, recalls three comments overtly referring to Hispanic national origin during the plaintiff's more than five-and-a-half years of employment:

In 2021, a co-worker stated that a basin in the sludge room resembled a "Mexican bowl."

In 2022, a co-worker stated that a cleaner had performed poorly "probably because she's Cuban."

In 2023, a co-worker stated that "Mexicans eat the shit out of sand cranes."

(Doc. 45 at 37 and 44; Doc 51-5 at 1–2)

- 4 -

The plaintiff recalls two comments that the plaintiff contends implicitly reference Hispanic national origin:

> On an unspecified date, a co-worker stated that the "lawn crew," apparently comprised of Hispanics, is "not worth a damn."
>
> On another unspecified date, a co-worker stated that "anybody that can read or write English can" pass a licensing examination.

(Doc. 45 at 37 and 47; Doc 51-13 at 41)

Finally, the plaintiff recalls one comment and two incidents involving neither an express nor implicit reference to Hispanic national origin but that the plaintiff attributes to discriminatory animus:

> In September 2022, after the plaintiff passed a C-license certification examination, a co-worker stated, "sure would suck if someone contacted [the licensing department] and told [the department] you don't deserve your license."[2]
>
> According to the plaintiff, in March 2023, after a heated exchange, a co-worker "got right in [the plaintiff's] face" and "put his hands on" the plaintiff.[3]
>
> On an unspecified date, a co-worker selected as a temporary replacement an Australian even though three Hispanic employees, including the plaintiff, possessed greater seniority than the Australian employee.[4]

---

[2] In a September 3, 2022 email to human resources, the plaintiff asserts that the co-worker "threat[ened]" the plaintiff because of the plaintiff's race and that the co-worker did not question the qualifications of another white employee who was later issued a license. (Doc. 51-12 at 1) In a July 26, 2023 video, the plaintiff acknowledges that the co-worker was "reprimanded" for the "threat."

[3] Human resources determined, however, that based on witnesses' competing testimony, the plaintiff was the aggressor in this interaction. (Doc. 45-1 at 4)

[4] The co-worker testified that the co-worker selected the Australian selected because of the Australian's "knowledge and skills on the job." (Doc. 45-1 at 43)

(Doc. 45 at 35, 39, and 45; Doc. 51-12 at 1–2)

Citing these six comments, the two incidents, the complaints he made in response, and his termination, the plaintiff alleges discrimination and retaliation in violation of (1) Title VII of the Civil Rights Act of 1964 (Title VII); (2) the Florida Civil Rights Act (FCRA); and (3) 42 U.S.C. § 1983 (Section 1983).

## DISCUSSION

### The Comments and Incidents Alleged in the Harassment Claims Either Do Not Concern National Origin or Are Insufficiently Severe or Pervasive

To state a claim for harassment under Title VII or Section 1983 the plaintiff must show: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his protected class; (4) the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment; and (5) a basis for employer liability. *Cotton v. Cracker Barrel Old Country Store, Inc.,* 434 F.3d 1227, 1231 (11th Cir. 2006).

As the defendant concedes, the plaintiff is a member of a protected class and was subjected to unwelcome conduct. But of the eight comments and incidents on which the plaintiff relies, only three expressly reference Hispanic national origin: the "Mexican bowl" comment, the remark that a cleaner performed poorly "probably because she's Cuban," and the statement that "Mexicans eat the shit out of sand cranes." The "lawn crew" comment and the "read or write English" comment require an inference that the speaker referred to

- 6 -

Hispanic employees and, by extension, to Hispanic national origin. Likewise, the temporary-replacement incident requires an inference that a co-worker's selection of an Australian employee for a one-week assignment, rather than a Hispanic employee, evidences anti-Hispanic animus. The remaining comment and incident — the threat to report the plaintiff and the workplace altercation — bear no evident connection to national origin.

Even if every comment and incident bore some connection to the plaintiff's national origin, none, whether alone or in combination, is sufficiently severe or pervasive to alter a term or condition of employment. *Muggleton v. Univar USA, Inc.* explains that:

> Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. . . . Measuring the severity requires accounting for two components: one subjective and the other objective. Not only must the employee perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment (the subjective part), but that perception must be objectively reasonable. In other words, "a reasonable person would find the environment hostile and abusive." This objective analysis requires asking about the frequency of the conduct, its severity, its nature (threatening or humiliating), and whether it unreasonably interfered with the employee's job performance.

2007 WL 28333, at *3 (M.D. Fla. Jan. 3, 2007) (Merryday, J.), *aff'd*, 249 F. Appx. 160 (11th Cir. 2007) (citing *Clark County School Dist. v. Breeden,* 532 U.S.

- 7 -

268, 270 (2001) and quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir.1999)) (cleaned up).

In *Muggleton*, the plaintiff alleged that co-workers routinely used profanity, yelled at the plaintiff on one occasion, frequently made disparaging comments about women in the workplace, and repeatedly mocked her age. Among other remarks, co-workers referred to women as "bitch[es]" and "blonde bimbo[s]," questioned whether the plaintiff had "got[ten] laid," and joked that her reading glasses made her look like an "old lady," that she was "older than dirt," and that she had been employed "as long as the building has been here." *Muggleton* found that "this conduct does not rise to the serious, pervasive level needed for actual discrimination under Title VII." *Muggleton*, 2007 WL 28333, at *4; *See also Barrow v. Georgia Pacific Corp.*, 144 Fed. Appx. 54, 57 (11th Cir. 2005).

Here, co-workers (not supervisors) made the comments over a period exceeding two years, and only three expressly referenced Hispanic national origin. The remaining incidents either concerned national origin only by inference or bore no apparent relation to national origin. Most notably, no comment concerns the plaintiff directly and none contains a derogatory racial or ethnic slur. Under these circumstances, no reasonable person could conclude that the conduct was sufficiently severe or pervasive to create an objectively hostile or abusive work environment.

**The Plaintiff Did Not Engage in Statutorily Protected Expression, and the Plaintiff Was Terminated for a Legitimate, Non-Pretextual Reason**

"To establish a prima facie case of retaliation [under Title VII],[5] the plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997), *abrogated on other grounds by Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019). "A plaintiff engages in statutorily protected activity when [the plaintiff] opposes an employment practice that she has a good faith, reasonable basis to believe is unlawful." *Diamond v. Morris, Manning & Martin, LLP*, 457 F. App'x 844, 846 (11th Cir. 2012) As explained in *Johnson v. Family Practice & Injury Center, Inc.*:

> The burden of establishing statutorily protected activity contains both a subjective component and an objective component. For the subjective component, a plaintiff must demonstrate that she subjectively — in good faith — believed that her employer engaged in unlawful employment practices. This requirement translates to demonstrating that the plaintiff subjectively believed that the unlawful employment practice complained of was racial discrimination. For the objective component, the plaintiff must demonstrate that her belief was objectively reasonable in light of the facts and record presented. The objective reasonableness of the belief is measured by reference to controlling substantive law.

437 F. Supp. 3d 1108, 1123 (M.D. Fla. 2020) (cleaned up)

---

[5] Or under the FCRA. *See Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1388–89 (11th Cir. 1998) ("[D]ecisions construing Title VII guide the analysis of claims under the Florida Civil Rights Act. Accordingly, because the plaintiffs cannot maintain a retaliation claim under Title VII, we conclude that the district court correctly dismissed the plaintiffs' Florida Civil Rights Act retaliation claim.").

In support of the contention that he engaged in statutorily protected expression, the plaintiff's motion for summary judgment states (1) that the plaintiff "complained to HR, his supervisors, and the union," but was "retaliated against and ultimately terminated on September 7, 2023" and (2) that the plaintiff "filed complaints regarding harassment, hostile work environment, and disparate treatment."[6] (Doc. 46 at 20–21)

Although the defendant concedes that the complaints evidence the plaintiff's subjective belief in the unlawfulness of the defendant's conduct, the belief was not objectively reasonable. For the reasons explained in connection with the harassment claim, the conduct the plaintiff opposed was unquestionably lawful. *See Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) ("Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of this Court or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable."). In any event, the defendant articulates a "legitimate,

---

[6] The plaintiff's "complaints" include (1) a September 3, 2022, e-mail titled "Concerning work environment," to human resources, alleging that a co-worker questioned the plaintiff's qualification for a C-license; (2) a March 3, 2023, e-mail titled "The Gate Keeper and The Shadow Creature," to human resources and other water plant employees, alleging generally that "the harassment is back . . . the slander is back . . . [and] the defamation of my character for no other reason than seething racism is back"; (3) a March 8, 2023, e-mail titled "Another day, another racist," to human resources, water plant employees, and government officials, alleging — in reference to the "read or write English" comment — that "the racism is getting more blatant"; (4) the July 17, 2023, "cease and desist" video described *supra* note 1; and (5) an August 8, 2023, charge of discrimination filed with the Florida Commission on Human Relations and the Equal Employment Opportunity Commission, re-alleging the purported instances of discrimination and harassment described in the earlier "complaints." (Doc. 74)

nondiscriminatory reason" for the plaintiff's termination: the plaintiff's falsified Class B license application and the plaintiff's non-compliance with the EAP referral.[7] *Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998).

## CONCLUSION

The defendant's motion (Doc. 44) for summary judgment is **GRANTED**, and the plaintiff's motion (Doc. 46) for summary judgment is **DENIED**. The clerk must enter judgment for the defendant and against the plaintiff and must close the case.

**ORDERED** in Tampa, Florida, on July 6, 2026.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[7] The plaintiff's motion enumerates five so-called "undisputed pretext markers" — an at best conclusory and at worst unintelligible attempt to show that the defendant's proffered reason for the termination was pretextual: (1) "shifting standards (50/25/25 and matrix not in policy/contract, applied selectively)"; (2) "training gatekeeping (promised OJT/SOP then withheld SOP)"; (3) "selective licensure scrutiny (Self contacted DEP about Chavez but not non-Hispanics)"; (4) "tolerance of slurs/physical contact"; and (5) "retaliatory escalation (EAP, disablement, email exclusion, termination)." (Doc. 46 at 10–11)